**Margaret L. CONROY, Plaintiff,**

v.

**CITY OF CHICAGO, Albert A. Raby, and Judy Stevens, individually and officially, Defendants.**

**No. 86 C 4221.**

United States District Court, N.D. Illinois, E.D.

March 16, 1989.

John L. Gubbins, John L. Gubbins & Assocs., Chicago, Ill., for plaintiff.

Judson H. Miner, Corp. Counsel, Jonathan Siner, Arthur N. Christie, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This is an action brought by Margaret Conroy against the City of Chicago ("the City") and two employees of the City challenging the termination of plaintiff's employment with the City. The case is brought pursuant to 42 U.S.C. §§ 1983 and 1985. Discovery has been completed,[1] and pending is defendants' motion for summary judgment.[2] For the reasons described below, defendants' motion is granted.

### II. FACTS [3]

■ Plaintiff Margaret Conroy, who is white, was employed by the City beginning in 1969 in the Commission on Human Relations ("Commission"). On March 2, 1979, she was given the position of Director of Program Services for the Commission.

---

1. The complaint was filed on June 11, 1986. On May 4, 1987, a discovery cut-off date was set for August 3, 1987. On July 16, 1987, the discovery period was extended to September 3, 1987. On January 29, 1988, at plaintiff's request, the discovery period was re-opened for the limited purpose of taking the deposition of Carmen Fonseca.

2. Plaintiff's cross-motion for partial summary judgment was stricken due to its untimeliness. It was filed on March 14, 1988, more than five months after the closing date set for substantive motions. (See minute order of March 17, 1988.)

3. The facts described in this section, unless otherwise noted, appear to be undisputed. Additional facts will be developed where relevant in the substantive analysis below. The Court's task in analyzing defendants' motion for summary judgment has not been made any easier by plaintiff's confusing attempt to comply with General Rule 12(f) of the Rules of the United States District Court for the Northern District of Illinois (the predecessor of the current Rule 12(m)). Rule 12(e) (now Rule 12(*l*)) required a summary judgment movant to submit a statement of material issues of fact as to which there is no genuine dispute. Rule 12(f) required the opponent to submit a statement of material facts as to which there is a genuine dispute. Plaintiff made two submissions in purported compliance with Rule 12(f). The first was a response to defendants' Rule 12(e) statement. This response did not clearly and concisely state what facts plaintiff believed to be in issue, nor did it clearly state which of defendants' stated facts were disputed by plaintiff. Rather, it was an argumentative collection of facts which plaintiff believed supported her case. Plaintiff's second submission was the narrative-style statement of facts which began her memorandum in opposition to defendants' motion. Again, this statement of facts did not assist the Court in determining which factual issues were disputed and which were not. Pursuant to Rule 12, the Court could grant defendants' motion based solely on plaintiff's failure to distinguish those facts which she believes to be undisputed and those facts as to which she contends there are genuine disputes. However, the Court has assumed the task of deciding the summary judgment motion on the merits. The Court takes this opportunity, though, to remind litigants that it is not always so tolerant. Rule 12 statements should not serve as another opportunity to attempt a narrative which "argues the facts," but rather as an aid to the Court in determining which facts are disputed and which are not. See generally Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir.1989).

She held Career Service status.[4] In January, 1980, she was transferred to the Department of Housing, still holding the title Director of Program Services and maintaining Career Service status.

In 1983, Harold Washington was elected Mayor of the City. On about October 12, 1983, plaintiff received a letter from Brenda Gaines, a Washington supporter who was appointed by Washington to head the Department of Housing, stating that plaintiff's employment was terminated effective October 19, 1983. This termination was rescinded on October 13, 1983. On November 29, 1983, Gaines relieved plaintiff of her duties and instructed her to vacate her office in the Department of Housing. In March, 1984, plaintiff was assigned to the position of Director of Program Services of the Commission. She served in that capacity from the middle of March, 1984, until April 16, 1986, maintaining Career Service status and her previous salary.

In February, 1985, defendant Albert Raby, a Washington supporter, was appointed Director of the Commission. Defendant Judy Stevens, another Washington supporter, became Duty Director of the Commission in January, 1986. On April 16, 1986, at 3:45 p.m., plaintiff was directed to appear at a meeting attended by Raby and Stevens. At that meeting, Raby and Stevens informed plaintiff that she was laid off as of 5:00 p.m. on that day, and Raby handed her a letter to that effect.

After plaintiff was laid off, a new, lower-grade position of Staff Assistant was created. This position was filled by Sandra Brown, a black woman. The parties dispute whether this person was a "replacement" for plaintiff. The parties agree that plaintiff handled fewer public relations than she had at the Department of Housing, and that she supervised no one although she had supervised a staff at the Department. The parties disagree over whether the reports and memoranda prepared by plaintiff were similar in the two offices.

Plaintiff filed this action on June 11, 1986. She essentially claims that she was fired because of her race and her failure to actively support Washington. Her original complaint was brought in two counts against the City, Raby, and Mayor Washington. Count I alleged that she had been deprived of property without due process of law, and Count II alleged that the layoff violated her rights under the First Amendment. On December 29, 1986, the Court dismissed portions of the complaint without prejudice due to plaintiff's failure to allege any personal involvement by the Mayor and her failure to allege that her layoff was caused by a policy, practice or custom by the City. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985).

Plaintiff's amended complaint, filed on February 23, 1987, is brought in five counts against the City, Raby and Stevens. Count I alleges that plaintiff was deprived of property without due process of law. Count II alleges that plaintiff was laid off in violation of the First Amendment. Count III alleges that plaintiff's layoff violated her right to equal protection of the law. Count IV alleges a racially motivated conspiracy in violation of 42 U.S.C. § 1985(3). Count V alleges racial discrimination in violation of Title VII of the Civil Rights Act of 1964.

Defendants contend that plaintiff's layoff was not motivated by political or racial considerations. They argue that plaintiff was laid off for essentially financial reasons; the position she occupied was not needed, so it was eliminated as part of a reorganization of the Commission.

After discussing the principles which guide analysis of summary judgment motions, the Court will address each of plaintiff's five counts, although not in the order presented in her complaint.

## III. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is warranted when there is no genuine issue as to any material

---

4. See Chgo. Mun.Code 25.1–3.

fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether plaintiff has met this standard, the Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Stewart v. RCA Corp.,* 790 F.2d 624, 629 (7th Cir.1986). Rather, plaintiff's evidence "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. However, where plaintiff bears the ultimate burden of proof, a defendant who moves for summary judgment on the basis that there is no genuine issue of material fact need not produce evidence showing the absence of a genuine issue. *Id.* at 324, 106 S.Ct. at 254. Once defendant points out the absence of a genuine issue, it becomes plaintiff's burden to present sufficient admissible evidence to demonstrate the existence of a jury question. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Toro Co. v. Krouse, Kern & Co.,* 827 F.2d 155, 162–63 (7th Cir.1987).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphases in original). Thus plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Id.* at 587, 106 S.Ct. at 1356. Plaintiff must produce sufficient evidence to allow a reasonable jury to return a verdict in her favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. *See also Beard v.*

*Whitley County, REMC,* 840 F.2d 405, 409–10 (7th Cir.1988).

## IV. TITLE VII (COUNT V)

Plaintiff's claim under Title VII requires her to demonstrate that her race was a motivating factor in defendants' decision to lay her off. The Supreme Court has defined the necessary showing as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), citing *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See also Wahab v. Portal Publications, Ltd.,* 851 F.2d 1011, 1014 (7th Cir.1988); *Andre v. Bendix Corp.,* 841 F.2d 172, 175 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 144, 102 L.Ed.2d 116 (1988). The Court will address the three steps in this analysis in turn.

### A. Prima Facie Case

■ In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court described the elements of a prima facie case alleging disparate treatment in hiring. The Court held that the plaintiff must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek

applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. The Court recognized that these elements were subject to modification in other contexts. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. In the context of alleged discrimination in a discharge, the Seventh Circuit has stated that a plaintiff must show by a preponderance of the evidence that she was fired from a job for which she was qualified, and which she was satisfactorily performing, while others not in the protected class were treated more favorably.[5] *Andre,* 841 F.2d at 175, quoting *Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175, 179 (3rd Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). *See also La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984).[6]

In this case, the parties have not presented substantial evidence or argument concerning whether plaintiff was satisfactorily performing her job or whether similarly situated black employees were treated more favorably. Regarding plaintiff's job performance, she presented some evidence that she received favorable evaluations. Defendants present some evidence of dissatisfaction with plaintiff's work, although it is not clear whether any of this dissatisfaction is due to any fault on plaintiff's part or is due to the nature of the position she held. *See infra* at Part IV.B. Most importantly, however, plaintiff has not presented sufficient evidence to create a genuine issue of fact with respect to defendants' treatment of black employees. Indeed, of six other employees whom plaintiff contends were subjected to adverse employment actions, three were black. *See infra* at Part V. Plaintiff emphasizes that the individual hired as Staff Assistant upon

plaintiff's discharge was black. However, this in itself is insufficient to raise an inference of discrimination. *Cf. La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1412 (7th Cir.1984) (replacement of employee with younger person did not mean that discharge was due to age). The court finds that plaintiff has not produced sufficient evidence to establish a prima facie case of discrimination.

### B. Defendants' Nondiscriminatory Reason

■ Even if the Court assumes that plaintiff could establish a prima facie case, plaintiff retains the ultimate burden of proving discrimination. Initially, the burden of production shifts to defendants to produce a non-discriminatory reason for plaintiff's layoff. Defendants contend that plaintiff was laid off not because of racial or political considerations but because the job functions of a public relations director were not needed at the Commission. In early 1986, Raby asked Stevens to make a study of the Commission and to make staffing, program and budget recommendations for the federal Community Development Block Grant (CDBG) for Year XII (July 1, 1986 to June 30, 1987). (Raby Dep. at 41; Stevens Dep. at 45–46.) On February 3, 1986, Stevens submitted a report to Raby which merits quotation at length:

*3. PR/PI Function vs. other needs*

   \* I recommend that this position be deleted from next year's CDBG budget and that we use our budget for a function we have greater need of being performed, e.g. the writing of reports and memoranda.

What we have now essentially is a very high grade (16) position for Director of Program Services, which is a pr/pi spe-

---

**5.** In the context of a reduction in force, a plaintiff may establish a prima facie case "by showing that [she] was within the protected age group, that [she] was performing according to [her] employer's legitimate expectations, that [she] was terminated, and that others not in the protected class were treated more favorably." *Oxman v. WLS–TV,* 846 F.2d 448, 455 (7th Cir. 1988). Use of this formulation of the test would not result in a different outcome in this case.

**6.** As explained in *La Montagne,* this indirect method of proving discrimination is an alternative to the more difficult direct method, under which the plaintiff must "meet his burden directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge." 750 F.2d at 1409. *See also Mays v. Chicago Sun–Times,* 865 F.2d 134, 136 (7th Cir.1989).

cialty position, when the bulk of our pr and pi is handled and can only be handled by program staff who have knowledge of special communities—and ethnic media—to which they relate.

By my observation, this is simply the way it has worked out this past year and I see no reason why it would change: when we have pr/pi needs relative to INS actions or immigrant groups, the immigrant program staff person handles it—usually from start to finish; the Asian–American Liaison handles pr/pi to Asian press and community. Margaret may do followup with reprographics to see when the Asian newsletter will be printed, for example; but Paul writes the copy, etc. When the commission on occasion responds to questions from the media, you usually handle it and I handled the FOI request from the tv reporter last year. Margaret assembled the files which the reporter had requested to review—but a secretary could have done so.

It sometimes takes more time to brief Margaret so that she can handle a request than it would to handle it without her. We are a small department without a need for our own ongoing, mainstream, high-visibility pr effort which a larger department might have. Our pr/pi is small scale and specialized and can be, and is, handled by existing staff.

What we do need is a staff position to write reports and memoranda and respond to requests for internal reports and offer general "work flow" assistance. This is really a function that we most need to be performed. We would obviously have to explore what the personnel consequences of such a change in budgeted positions would be; if you think this is an option, I will do so.

This might result in significant personnel cost savings, since the less specialized position is likely to be lower grade; and the change would require almost no changes in our MBO plan.

Raby accepted Stevens' recommendation, and it was subsequently approved by the City Department of Personnel. (Raby Dep. at 50.) The position of Director of Program Services in the Commission was removed from the CDBG budget as of June 30, 1986.[7] The position of Staff Assistant, at a lower pay grade, was inserted in the budget effective July 1, 1986. The duties of the Staff Assistant position focus more on writing reports and memoranda, and they differ substantially from the functions of the position of Director of Program Services.[8] Several Commission employees were also reclassified downward or upward.

Thus defendants argue that plaintiff was laid off because she was a highly paid employee who simply was not needed.[9]

7. Previous attempts by Raby and Stevens to add an administrative assistant had been rejected due to a lack of funding.

8. The position descriptions for Staff Assistant provide in part:

CHARACTERISTICS OF THE CLASS: Under direction, assists executive by relieving him of all management tasks that do not require his direct attention; and performs related duties as required.

EXAMPLES OF DUTIES: Studies management methods in order to improve work flow; simplifies reporting procedures and/or implements cost reductions; analyzes unit operating practices such as record keeping methods, personnel requirements and performance standards to develop and/or revise procedures; studies methods of improving work measurement and performance standards.

Assists in developing departmental policies; installs and interprets programs, plans and procedures; sets standards and establishes necessary controls to insure that major departmental policies, plans and procedures are carried out. Coordinates and provides staff assistance in all operations not covered by specific procedures, including planning for future organization structure.

Provides aid to division managers in specialized areas upon request or assignment, utilizing both specialized professional knowledge and the office of the executive.

Plans and coordinates with the executive secretary to insure the efficient operation of the office of the executive. Insures that emergency matters are brought to the executives attention immediately.

Reviews all correspondence received by the executive decision making.

9. Defendants contend that the layoff was performed pursuant to Rule XII of the City of Chicago Personnel Rules, which provides in part:

In the absence of sufficient work or funds, or upon abolition of a position because of a

She was laid off as part of a small reorganization which involved the creation of a new position at a lower pay grade which encompassed more vital functions. This rationale offered by defendants suffices to meet their burden of showing a valid, nondiscriminatory reason for the layoff.

### C. Pretext

■ Defendants having presented a valid, nondiscriminatory reason for plaintiff's layoff, the burden reverts to plaintiff to establish that defendants' proffered reason is a pretext for discrimination. "The plaintiff can meet this burden by demonstrating either that the employer's explanation is unworthy of credence or that it is more likely that a discriminatory reason actually accounted for the employer's actions." *Andre, supra,* 841 F.2d at 175. If plaintiff fails to produce sufficient evidence to allow a reasonable jury to conclude that defendants' proffered reason is a pretext, defendants are entitled to summary judgment. *Mays v. Chicago Sun–Times,* 865 F.2d 134, 137 (7th Cir.1989); *Klein v. Trustees of Indiana University,* 766 F.2d 275, 282 (7th Cir.1985). *See also, e.g., Andre,* 841 F.2d at 176; *Beard v. Whitley County, REMC,* 840 F.2d 405, 412 (7th Cir.1988); *Lee v. National Can Corp.,* 699 F.2d 932, 937 (7th Cir.), *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983).

Plaintiff has not directly argued that she has produced evidence which supports a finding of pretext in the Title VII context.

However, with respect to her due process count she does present three arguments in support of a pretext claim. *See infra* at Part VIII. Despite plaintiff's failure to rely on those arguments in support of her Title VII claim, the Court will examine them to determine whether they suffice to create a genuine issue of material fact allowing plaintiff to survive summary judgment on her Title VII claim.

First, plaintiff argues that defendants Stevens and Raby did not inform the Commissioner of Personnel that they believed plaintiff was not working within her job description. Rule I, Section 8 of the City Personnel Rules provides:

Section 8—Reallocation of Positions

(a) A department head shall report to the Commissioner of Personnel whenever a significant change is made in the duties and responsibilities of a position involving either the adding of new duties or the taking away or modification of existing duties.

(b) The Commissioner of Personnel, upon his or her own initiative, or at the request of a department head, may investigate the allocation of a position and, if justified, shall reallocate the position to a more appropriate class.

(c) A position may be reallocated to a more appropriate category based on the standards set forth in Chapter 25.-1–3 of the Municipal Code.

(d) When reallocation requires, the Commissioner of Personnel shall cre-

change in duties associated with it, or because of a change in organizational structure, reductions in force, including layoffs, may be made.

(a) *Notice*—Whenever a reduction in force occurs, the appropriate department head shall give written notice to the Commissioner of Personnel and to the affected employee.

(b) *Order of Separations and Lay-Offs*—Reductions in force shall be made according to class within a department. They shall be made in the following order in the department: first, provisional employees in the class must be separated; next, Probationary Career Service employees in the class must be separated, then Career Service employees in that same class may be laid off.

The department head shall determine the order of separation of provisional and of Probationary Career Service employees. When em-

ployees with Career Service status are laid off, such lay-off shall be made according to Career Service seniority in the class from which lay-offs are to be made within the department. If two or more employees have equal Career Service seniority, the department head shall determine the order of layoff of such employees based on appropriate job-related factors.

(c) *Reinstatement of Career Service Employees* —The names of employees with Career Service status who are laid off shall be placed on appropriate lay-off lists and shall be considered preferentially for reappointment to their former positions in accordance with the Personnel Rules on *Employment Lists* and on *Certifications.*

Although plaintiff contends that defendants failed to comply with Rule I, Section 8, *see infra* at Part IV.C., she does not argue that defendants have failed to comply with Rule XII.

ate a new class or make other appropriate changes in the Classification and Pay Plan, Schedule A.

(e) The Commissioner of Personnel shall transmit to the department head concerned and to the Budget Director a report setting forth any amendment to the allocation of a position or any other modification of the classification plan.

Plaintiff argues that the failure to notify the Commissioner pursuant to Section 8(a) is evidence that any reorganization was a pretext to discharge plaintiff. Defendant responds that Section 8 simply does not apply to this case because the duties of plaintiff's position never changed. Plaintiff cites deposition testimony which indicates defendants' belief that plaintiff was not performing the public relations duties of her position, but was rather writing reports and memoranda. (Raby dep. at 35.) Plaintiff describes Section 8 as requiring defendants to notify the Commissioner of Personnel of their belief that plaintiff was not working within her job description. On its face, however, Section 8 does not apply to a situation in which an employee may actually be performing duties other than those envisaged by the job description; it applies where the responsibilities of the position itself are altered. Here, according to defendants, the responsibilities simply were not necessary in the Commission, and plaintiff was therefore performing other duties instead.[10] Because Section 8 did not apply to plaintiff's circumstances, defendants' failure to notify the Commissioner of Personnel of a change of duties is not evidence from which a jury could find that the reorganization was a pretext.[11]

Second, plaintiff presents evidence which allegedly shows that defendants did require a high level public relations employee

at the Commission. The Commission's 1988 budget proposal included funding for a position entitled Coordinator of Program Services. Plaintiff's argument as to the significance of this proposal is vague and disjointed, and she does not present any evidence that the inclusion of a Coordinator of Program Services in the proposed budget was indicative of a need for a high level public relations position.

Defendants offer the following explanation of the inclusion of this position. In 1987, the Commission was given responsibility for assisting in the administration of the Federal Immigration Reform and Control Act of 1986 ("IRCA"). To fulfill this responsibility, the Commission proposed three additional positions in the 1988 City Budget: Director of Planning, Research and Development; Assistant Director for Strategic Planning; and Human Relations Officer 2. These proposals were made late in the budget process, so they were submitted directly to the budget office rather than to the Department of Personnel for review. Someone in the budget office then changed the title for the second position to Coordinator of Program Services. The Department of Personnel subsequently performed a routine evaluation of the requested new positions and determined that the position should be entitled Assistant Director of Planning, Research and Development. Under this title, the position was enacted in the 1988 budget. The job description for this position describes the duties in part as "assist[ing] in the overall management and administration of a variety of activities related to the planning, development and evaluation of social service delivery systems." It does not refer to public relations duties. In the context of the Commission's 1988 budget proposal, the duties involved planning and assisting

---

**10.** Defendant Stevens described the issue as follows:

Q: Why didn't you recommend that Margaret Conroy be classified downward rather than abolish this position?
A: Because the duties that she was supposed to be doing, the two positions had no relationship to each other that I could see. And her performance in the—those particular duties outside her title I did not think were very good and

it seemed the most appropriate way to deal with the problem of having a title that we didn't need. (Stevens Dep. at 65.)

**11.** Commissioner Hoskins' office did receive notice of the layoff, and the layoff was approved by his assistant, who he stated routinely signed such requests on his behalf. (Hoskins Dep. at 34–35.)

various departments in helping citizens and other agencies meet IRCA guidelines.

Plaintiff responds to this version of the budget proposal by presenting the testimony of Commission employee Carmen Fonseca that, contrary to defendants' assertions, the budget proposal was not submitted late and the budget office does not change position titles. This limited impeachment of defendants' position is insufficient to raise an inference that the appearance of the title "Coordinator of Program Services" in the proposed budget indicates a need in the Commission for a high level public relations employee. Furthermore, the budget proposal excerpt offered by plaintiff in support of her position lists the position of Coordinator of Program Services under the heading "Immigration Reform and Control Act Administration." This heading provides strong support for defendants' argument that the position in question involved IRCA administration rather than public relations duties. Thus plaintiff has presented no evidence that the Commission needed a high level public relations employee. The inclusion of the title Coordinator of Program Services in the 1988 proposed budget provides no evidence from which a jury could find that the 1986 reorganization was a pretext.

Plaintiff's third argument in support of her pretext theory is that defendants were motivated by racial and political bias. This argument fails for the reasons discussed *supra* at Part IV.A. and *infra* at Parts V and VI.A. Plaintiff simply has not produced sufficient evidence to allow a reasonable jury to find that such racial or political bias motivated her layoff. *Cf. La Montagne, supra,* 750 F.2d at 1414 (where evidence of improper motivation for discharge was insufficient to constitute direct proof of discrimination, it was also insufficient to support a showing of pretext).

In *La Montagne,* the Seventh Circuit suggested three ways in which a plaintiff might demonstrate pretext where the plaintiff was unable to present sufficient direct evidence of improper motivation for a discharge: "by showing that the [employer's] reasons have no basis in fact, or, if they

have a basis in fact, by showing that they were not really factors motivating the discharge, or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." 750 F.2d at 1415. Here, in light of the evidence presented by defendants, plaintiff would be hard pressed to argue that defendants' reasons have no basis in fact. Furthermore, plaintiff has not presented any evidence which tends to show that those reasons were not really factors motivating her layoff. And finally, plaintiff has not presented evidence that the proffered reasons were insufficient to motivate her layoff.

Thus, none of the arguments presented by plaintiff is supported by sufficient evidence to allow a reasonable jury to conclude that defendants' proffered reasons for plaintiff's layoff are pretextual. Both with respect to plaintiff's initial burden of showing a prima facie case and, even assuming a prima facie case, with respect to plaintiff's burden of showing that defendants' reasons are pretextual, plaintiff's evidence consists primarily of her own perception of the circumstances surrounding her layoff. Such a perception is insufficient to make defendants liable. *Andre,* 841 F.2d at 176. As in *Beard, supra,* plaintiff's evidence, "whether evaluated separately or in combination, raise, on this record, [nothing] more than the 'metaphysical doubt' that, under the holding of *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356, is insufficient to create a genuine issue of material fact." 840 F.2d at 410. Defendants are therefore entitled to summary judgment on Count V.

## V. EQUAL PROTECTION CLAIM (COUNT III)

In order for plaintiff to prevail on her equal protection claim, plaintiff must initially prove that a racially "discriminatory purpose was a motivating factor" in defendants' decision to lay her off. *Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 270, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977). The burden then shifts to defendants to prove that plaintiff would have been laid off even absent the discriminatory purpose. *Id.* at

270 n. 21, 97 S.Ct. at 566 n. 21.[12] Defendants argue that plaintiff has failed to produce sufficient evidence to allow a reasonable jury to conclude that defendants' decision was motivated by a racially discriminatory purpose. Alternatively, defendants argue that plaintiff has prodcued no evidence to counter defendants' overwhelming evidence that plaintiff would have been laid off even in the absence of any racially discriminatory motive.

In support of her position that her layoff was motivated by a racially discriminatory purpose, plaintiff presents two arguments. First, she states that other white employees were subject to adverse employment decisions due to their race. Second, she states that she was replaced by a black employee who performs the same duties which plaintiff had performed. (Memorandum in Opposition at 27.)

With respect to her first argument, plaintiff has not produced sufficient evidence of a pattern of adverse employment decisions directed predominantly against white employees to give rise to an inference of discriminatory intent. Plaintiff claims that defendants attempted to drive three other white employees—Marvin Weiss, Don Colonna and Evelyn Zisserson—out of the Commission because of their race. The only evidence concerning Weiss is the following testimony from plaintiff's deposition:

Q: ... tell me what facts you have concerning Marvin Weiss that he has been harassed by the defendants Raby and Stevens politically or racially?

A: He has a long record in city government and excellent one up until Al Raby became Commissioner. And he has had several suspensions which I believe constitute harassment.

Q: Do you have any knowledge as to what was behind those suspensions:

A: I don't know.

Q: Have you ever seen his personnel—his personnel records with the Commission?

A: No, I have not.

Q: Have you ever discussed this case with—his—his case with him?

A: I have had general conversation with him.

Q: What has he told you?

A: He has told me that there have been all kind of things put in his personnel file that he wasn't aware of and that he has had several discussions with the union which has helped him on several occasions in terms of handling his situation in the Department itself. And that he also consulted with an attorney and he is filing a complaint with the EEOC....

Q: Do you have any knowledge as to the reason the Commission suspended him?

A: I don't know.

(Conroy Dep. Vol. II at 24–25.) This evidence is hearsay, and to the extent it purports to establish that any actions taken against Weiss were racially motivated, it is based only on plaintiff's own speculation and belief. Plaintiff also submits a copy of a charge filed by Weiss with the EEOC. This, too, is hearsay, and it shows only that such a charge was filed, not that Weiss was harrassed due to his race.

With respect to Don Collona, plaintiff cites the following two passages of her own deposition testimony:

Q: ... I would like to ask you what facts did you base that statement [concerning the institution of a policy to drive out employees who had not supported Washington or who were white] upon?

A: Based on a couple of things: First of all my own firing in city government; based upon lay-offs I had seen in the Department of Housing. And based on observations within the Commission of Human Relations.

* * * * * *

Q: You also said you based your statement on observations in the Com-

---

12. Plaintiff must thus prove intentional discrimination. The inquiry is essentially the same as in the Title VII context, *see American Nurses'* *Ass'n v. State of Illinois,* 783 F.2d 716, 722 (7th Cir.1986).

mission on Human Relations. What observations are you referring to?

A: The firing of Cordelia Walker. The terminations, as you will, of Evelyn Zisserson. The termination of—or if you want to call it that but they certainly left under very difficult circumstances, Donald Lightfoot.

Q: Donald Lightfoot?

A: Lightfoot. And the removal of Donald Collona, that is while I was there.

(Conroy Dep. Vol. II at 4–14.)

Q: How do [you] know Judy Stevens was a supporter of Mayor Washington?

A: Because Don Collona was removed from his position to make room for Al [Raby]'s choice Judy Stevens.

Q: When Don Collona left where did he go?

A: To the Department of Personnel.

Q: In what position?

A: I don't know his title.

Q: But did he go right over to the Department of Personnel?

A: He was told he had to—that he—he—what he told me was that he was told he had to leave his position at the Commission on Human Relations and look for other employment, and subsequently did find an opening in the Department of Personnel.

(Conroy Dep. Vol. II at 60–61.) Again, this evidence is hearsay and speculation. It does not support an inference that Collona was laid off due to his race.

With respect to Zisserson, plaintiff cites only the testimony referred to *supra* at —— and the following:

Q: And Evelyn Zisserson, who I think you already referred to, you didn't know who she supported in the 1983 mayoral elections?

A: No.

Q: Do you have any information as to why she was terminated from the Commission?

A: She—actually what she told me was that she submitted a retirement, she decided to retire because she couldn't take the harassment any more.

Q: Did she indicate to you what harassment she was talking about?

A: She was in charge of the workshop program at Al's direction, Al Raby's direction. He was trying to implement some changes, without clear cut direction from him. She couldn't get a clear cut understanding in terms of what he wanted but he seemed to reject everything she brought to him.

So she said she had been through enough harassment, while she planned on not retiring as soon as she did she said leave me alone and I will retire.

Q: So that is what she considered harassment and that is what she told you?

A: That is correct.

(Conroy Dep. Vol. II at 28–29.) Again, this evidence is hearsay and does not support an inference that Zisserson was harassed due to her race.

Thus with respect to each of the three employees to whom plaintiff refers in support of her first argument, she presents no credible, admissible evidence of the occurrence of adverse employment actions or of the motivation for any such actions. Furthermore, even if it is assumed that each of these three individuals were subjected to adverse employment actions, there is insufficient evidence of a pattern of such actions taken against white employees to support an inference of racial intent. Plaintiff has alleged that the Commission members (other than herself) who were subjected to adverse employment actions were Weiss, Zisserson, Lightfoot, Collona, Cordelia Walker, and Dennis Martin. (Complaint, ¶ 20; Conroy Dep. Vol. II at 13.) Of these six employees, only three (Weiss, Zisserson and Collona) are white. Thus plaintiff has not even demonstrated a pattern of whites being harassed or discharged while blacks were retained. Plaintiff's first argument, therefore, provides no evidence of racial motivation for Conroy's layoff.

With respect to plaintiff's second argument, the parties dispute whether plaintiff was actually replaced by Sandra Brown. Plaintiff argues that Brown actually performed the same duties previously per-

formed by plaintiff. Defendants argue that Brown occupied a different position, with different job functions and different actual duties. There appears to be a genuine dispute as to whether Brown actually performed the same duties previously performed by plaintiff. However, even assuming that this issue is resolved in plaintiff's favor, it does not, by itself, create sufficient evidence to allow an inference of a discriminatory motive. The fact that plaintiff was replaced by a black woman would not establish that plaintiff was laid off *because* she was white. *See American Nurses Ass'n v. State of Illinois*, 783 F.2d 716, 722 (7th Cir.1986) (discriminatory impact insufficient to show discriminatory purpose); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984) (the fact that a member of a protected class was replaced by somebody outside of the class does not mean that the replacement was due to improper motive).

The Court thus finds that plaintiff has not presented sufficient evidence to allow a jury to conclude that her layoff was motivated by a racially discriminatory purpose. Furthermore, even assuming that plaintiff could establish a racial motivation, the burden would then shift to defendants to prove that plaintiff would have been laid off even absent the racial motivation. As described above, plaintiff has not presented any evidence to rebut defendants' evidence that defendants had an independently sufficient motive for plaintiff's layoff. *See supra* at Part IV.C. Thus, even though defendants would have the burden of proof on this issue at trial, plaintiff has failed to produce enough evidence to create a genuine issue of fact. Defendants are therefore entitled to summary judgment on Count III.

## VI. FIRST AMENDMENT CLAIM (COUNT II)

In Count II, plaintiff alleges that she was laid off because she was not an active supporter of Washington during the mayoral campaign. Defendants argue that Count II fails because plaintiff has not produced sufficient evidence to allow a jury to conclude that plaintiff's political views or conduct were a substantial factor motivating her layoff, and, alternatively, because plaintiff's position was exempt from the general prohibition on layoffs based on political considerations.

### A. Intent

■ In order to prevail on her first amendment claim, plaintiff has the initial burden of proving that her conduct was constitutionally protected and that her conduct was a "substantial" or "motivating" factor in defendants' decision to lay her off. *Mount Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). This is the same standard adopted in *Arlington Heights, supra*, with respect to equal protection claims. *Id.* at 287 n. 2, 97 S.Ct. at 576 n. 2. The burden then shifts to defendants to prove by a preponderance of the evidence that they would have taken the same action even in the absence of plaintiff's protected conduct. *Id. See also Morales v. Cadena*, 825 F.2d 1095, 1099 (7th Cir.1987); *Perry v. Larson*, 794 F.2d 279 (7th Cir.1986).

For purposes of this motion, defendants do not dispute that plaintiff engaged in constitutionally protected conduct. The Court, then, must determine whether the evidence produced by plaintiff is sufficient to allow a reasonable jury to conclude that this conduct was a substantial or motivating factor in her layoff. Plaintiff argues that four facts support such a finding: (1) defendants knew plaintiff was not an active Washington supporter; (2) plaintiff was replaced with a Washington supporter, and the resultant budget savings was used to promote another Washington supporter; (3) plaintiff was the only Commission employee who was laid off—others were merely reclassified; and (4) there was a pattern of adverse employment actions taken against employees who did not support Washington. (Memorandum in Opposition at 23–25.) The Court will address these issues in turn.

Plaintiff first contends that defendants were aware that she did not actively campaign on Washington's behalf. Defendants

emphasize that no one knew who plaintiff voted for or supported during the 1983 mayoral elections, a fact admitted by plaintiff. However, it would be reasonable to find that active supporters of Washington would have known that plaintiff was not also an active supporter of Washington. The Court concludes that defendants' awareness of plaintiff's lack of active support for Washington is a genuine issue of fact.

Second, plaintiff argues that she was replaced by Sandra Brown, a Washington supporter, and that with the resultant budget savings, Commission employee Randy Pauley, another Washington supporter, was reclassified to a higher salary level. The parties argue at length over the issue of whether plaintiff was in fact "replaced" by Brown. The Court finds that the evidence is sufficient to create a genuine issue of fact as to such replacement. However, plaintiff has not produced any evidence that defendants knew that Brown supported Washington. Brown never worked on behalf of any political candidate, and her only donation to a political campaign was a ten-dollar donation made at a political affair in connection with Washington's 1987 re-election campaign. This donation is insufficient to support any inference that Brown was a Washington supporter in 1986 or, more importantly, that defendants knew that Brown was a Washington supporter at that time. In the absence of evidence supporting such an inference, the Court will not consider plaintiff's replacement by a Washington supporter to be indicative of a political motivation by defendants.

Similarly, there is no evidence that defendants knew who Pauley supported in 1986. Plaintiff's only evidence that Pauley was a Washington supporter is a document which indicates that Pauley made a contribution of 150 dollars to Washington's re-election campaign in 1987. Again, the Court finds this evidence insufficient to allow consideration of Pauley's 1986 reclassification on the issue of defendants' political motivation.

Third, plaintiff asserts that defendants' political motivation is demonstrated by the fact that she was laid off, while other Commission employees were only reclassified. This argument simply is not probative. The fact that plaintiff may have been subject to a unique adverse employment action does not provide any indication as to the motivation for that action. Furthermore, while plaintiff names several Commission employees who were reclassified (Randy Pauley, Ernestine Eldridge, Dorothy Johnson, Claudia Green, Carmen Fonseca, and Gwen Ratcliffe), she does not provide evidence of the political views or activities of these employees. In the absence of such evidence, disparate treatment of plaintiff compared to the other employees is not probative of defendants' intent. (The Court also notes that plaintiff does not provide evidence of the date that these employees were reclassified; the Court thus cannot ascertain whether the reclassifications occurred in a time period reasonably close to plaintiff's layoff.)

Fourth, plaintiff contends that there was a pattern of politically-motivated actions against Commission employees which supports an inference that her own layoff was politically motivated. Plaintiff submits a copy of a complaint filed by Cordelia Walker to initiate a lawsuit alleging that she was effectively discharged for political reasons, and a copy of an EEOC charge filed by Marvin Weiss alleging harassment due to race, age, and political considerations. These documents, however, are hearsay and provide no competent evidence in support of plaintiff's position. *See also supra* at Part V. Plaintiff also states that Evelyn Zisserson told her that she was subjected to harassment for political reasons. Plaintiff's citation, however, is to plaintiff's own deposition, in which she testified that Zisserson stated she retired because of harassment. The deposition also indicates that plaintiff did not know who Zisserson supported in the 1983 mayoral election, and it does not contain any indication that the harassment was political. Thus not only is plaintiff's evidence hearsay, it is not rele-

vant to any political motivations.[13]

Thus, of the four arguments which plaintiff urges in support of an inference of political motivation by defendants, the only one as to which there is a genuine issue is the contention that defendants knew plaintiff was not an active Washington supporter. This evidence is not, in itself, sufficient to allow a reasonable jury to conclude that plaintiff's political beliefs or activities (or lack thereof) were a motivating or substantial factor in plaintiff's layoff.

Furthermore, even assuming that plaintiff's layoff was, in part, politically motivated, plaintiff cannot survive a motion for summary judgment if she cannot produce sufficient evidence to create a genuine issue of fact in response to defendants' showing that she would have been laid off even in the absence of any political motive. Plaintiff has not met this burden of production here, for the reasons described in the equal protection context above. *See supra* at Part IV.C. Defendants are therefore entitled to summary judgment on Count II.

### B. Exemption From First Amendment

Defendants also seek summary judgment on Count II on the alternative ground that plaintiff's position was exempt from first amendment constraints. Dismissal of certain types of governmental employees on the basis of political considerations has been accepted as within constitutional boundaries. The purpose of this exemption for certain employees "is to ensure that the first amendment's protection not interfere with the working of democratic governments and the ability of duly elected officials to implement their policies." *Shakman v. Democratic Organization of Cook County,* 722 F.2d 1307, 1310 (7th Cir.), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983).

In *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opin-

ion), the Supreme Court found actionable the dismissal of nonpolicymaking government employees for patronage reasons, but recognized that its holding would not extend to policymaking employees. The Court stated: "An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position.... [C]onsideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." 427 U.S. at 368, 96 S.Ct. at 2687.

In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court abandoned the "policymaking" label and framed the test for the legitimacy of a political dismissal as "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. As applied by the Seventh Circuit, "an employee's position is unprotected if, first, there is room for principled disagreement in the decisions reached by the employee and his superiors, and, second, he has meaningful direct or indirect input into the decisionmaking process." *Tomczak v. City of Chicago,* 765 F.2d 633, 641 (7th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).

The Seventh Circuit has noted that the *Branti* analysis applies to the City of Chicago where one faction of a political party is replaced by another faction of the same party. *See Tomczak,* 765 F.2d 633, 640 (7th Cir.1985). Thus plaintiff's first amendment claim fails if she occupied a position for which loyalty to Mayor Washington was an appropriate qualification.

In making this determination, the Court must examine the nature of the position held by plaintiff rather than the particular duties performed by plaintiff herself. *Tomczak,* 765 F.2d at 640–41. "[I]f an officeholder performs fewer or less important functions than usually attend his posi-

---

**13.** Plaintiff also argues that a wave of politically motivated dismissals occurred in 1983 as one of Washington's first personnel decisions. However, all of the positions cited by plaintiff (including her own position at the Department of Housing) were Shakman exempt positions. *See infra* at n. 14. The Court finds that evidence of legitimate political discharges in 1983 could not reasonably support an inference that a 1986 discharge was politically motivated.

tion, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance." *Id.* at 641.

In describing plaintiff's positions as Director of Program Services for the Department of Housing and the Commission on Human Rights, defendants refer to written job descriptions prepared by the City. The first is a document dated July, 1980, describing a class of positions entitled Director of Program Services. The position is described as follows:

CHARACTERISTICS OF THE CLASS: Under direction, plans, organizes, and directs public relations/public information for a major City agency; and performs related duties as required.

EXAMPLES OF DUTIES: Writes and edits speeches for executive personnel and members of committees. Arranges press conferences, interviews, and appearances on radio and television programs. Supervises a group of professional and para-professional employees in public relations activities. Coordinates the publication of reports and magazines.

The document also describes the "desirable minimum qualifications" for the position:

Training and Experience. Graduation from an accredited college or university with Bachelor's degree in Journalism, Public Relations or a directly related field supplemented by seven years of progressively responsible experience in the dissemination of public relations information including one year of supervision or an equivalent combination of training and experience.

Knowledge, Abilities and Skills. Thorough knowledge of Department and/or City activities, policies and programs. Thorough knowledge in the practices of disseminating public relations information.

Ability to coordinate and establish timely schedules. Ability to be diplomatic and programmatic.

Strong analytical, written and oral skills.

The second document, dated late 1985, is an announcement of an examination for the position of Director of Program Services. It describes the position's duties as follows:

Under general direction, the Director of Program Services directs the planning, organizing and development of programs to provide public information on behalf of a major City agency. Develops and implements promotional campaigns and coordinates the publication of program report brochures, flyers and other publicity materials. Arranges press conferences, interviews and appearances for print and for electronic media. Functions as the designated agency representative to the media, communities and neighborhood agencies and the general public. May establish and/or direct committees engaged in program evaluation and related activities. Performs related duties as required.

This document also describes the qualifications for the position:

Graduation from an accredited college or university with a Bachelor's degree supplemented by six years of progressively responsible experience in the development of public interest, or public information programs including two years of supervisory experience or an equivalent combination of training and experience is required.

Defendants argue that the position of Director of Program Services, as described in these documents, is a position for which political loyalty is an appropriate qualification. Defendants describe the position as a press secretary for a cabinet-level official, necessitating the trust and confidence of that official.

Plaintiff responds by focusing on the context of her 1983 transfer to the Commission on Human Relations and on the actual duties she performed for the Commission. As she describes the circumstances, she was transferred to the Commission from the Department of Housing because Brenda Gaines, then the Director of the Department, wanted a Washington sup-

porter in the *"Shakman* exempt"[14] position of Director of Program Services for the Department. Plaintiff was accordingly transferred to the Commission, where she performed fewer duties, had less responsibility, did not control a budget, and supervised no employees. Plaintiff contends that she was transferred from a policymaking to a nonpolicymaking position.

■ Plaintiff's argument fails because of its complete reliance on the duties plaintiff actually performed rather than on the functions of the position she held. *See Tomczak,* 765 F.2d at 640–41. She admits that the position of Director of Program Services is an exempt position in the Department of Housing, but she argues that in light of her diminished responsibilities at the Commission on Human Relations, the same position is no longer exempt. Plaintiff offers no argument, however, that the nature of the position with the Commission —a position which is not defined differently for different agencies—is such as to qualify for first amendment protection.

■ The Court recognizes that the determination of whether plaintiff's position is exempt from first amendment protection is a question of fact and that questions of fact are generally inappropriate for resolution in the context of a summary judgment motion. However, where, as here, plaintiff presents no evidence in support of her position with respect to a factual question, the Court must conclude that no genuine issue of fact exists. Plaintiff has produced no evidence that the nature of the position, rather than the duties which she actually performed, make the position one for which political loyalty is not an appropriate qualification. Furthermore, the Court agrees with defendants that the position is exempt from the general prohibition on political dismissals. As the individual who oversees public relations for a City agency, the Director of Program Services is intimately involved with political concerns. The inter-

action of an agency with the media and the public is a vital aspect of the agency's policies. *Cf. Herman v. City of Chicago,* 870 F.2d 400, 403–04 (7th Cir.1989) (based on job description including such duties as liaison with public officials and attendance and speaking at meetings of City Council and other organizations, court concludes that position of Director of Field Operations of the Department of Housing is exempt).

The Court therefore finds that defendants are entitled to summary judgment on the first amendment count for the alternative and independent reasons that plaintiff has failed to produce sufficient evidence to establish a genuine issue of fact with respect to defendants' motivation in dismissing her and that she has failed to produce sufficient evidence to establish a genuine issue of fact concerning the inappropriateness of political loyalty as a qualification for the position she held.

## VII. SECTION 1985(3) CLAIM (COUNT IV)

In order to prevail on her claim under 42 U.S.C. § 1985(3), plaintiff must establish that defendants engaged in a conspiracy motivated by racial considerations. Specifically, plaintiff must prove four elements: (1) a conspiracy (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Grimes v. Smith,* 776 F.2d 1359, 1363 (7th Cir.1985). Thus in order to prevail on this claim, plaintiff must again prove racial motivation on the part of defendants. As explained with respect to plaintiff's equal protection and Title VII claims, plaintiff

---

**14.** In *Shakman v. Democratic Organization of Cook County,* 569 F.Supp. 177 (N.D.Ill.1983), the court enjoined the City from basing hiring decisions on political considerations. The court also set forth, in an appendix to its opinion, a list of positions which were exempt from this order. That opinion formulated a remedy to implement an earlier order granting partial summary judgment for the plaintiffs. 569 F.Supp. 177 (N.D.Ill.1979). The earlier order was reversed on standing grounds in *Shakman v. Dunne,* 829 F.2d 1387 (7th Cir.1987).

has failed to produce sufficient evidence to create a genuine issue with respect to such a motivation. Defendants are therefore entitled to summary judgment on Count IV.

## VIII. DUE PROCESS CLAIM (COUNT I)

■ In Count I, plaintiff alleges that her layoff constituted a deprivation of property without due process of law. Defendants invoke the exception whereby a hearing is not required when a discharge is caused by a reorganization. *See Misek v. City of Chicago*, 783 F.2d 98, 100 (7th Cir.1986). As the court in *Misek* made clear, the reorganization exception defeats plaintiff's due process claim unless the reorganization was simply a sham or pretext for laying her off. *Id.* at 100–101. Defendants contend that plaintiff has produced insufficient evidence to create a genuine issue of material fact as to whether the reorganization was a sham.

■ In support of her claim that the reorganization was a sham, plaintiff relies on the three arguments examined above with respect to her Title VII claim. (*See* Plaintiff's Memorandum in Opposition at 20–22.) As described above, plaintiff's evidence is insufficient to raise a jury question as to whether the reorganization was a pretext designed to disguise a discriminatory motive. *See supra* at Part IV.C. However, the determination of whether a reorganization was a pretext or sham is different in the context of due process than it is in the context of Title VII. A due process claim is not available if a layoff was made pursuant to a reorganization in fact, regardless of a possible improper motive behind the reorganization. *See Misek*, 783 F.2d at 100–01. Thus the sham analysis in the due process context focuses not on defendant's motive, but on whether a reorganization actually occurred. In *Misek*, the court remanded the case for determination of whether the plaintiffs "were discharged pursuant to a reorganization in fact," in which case plaintiffs would not be entitled to relief; the court distinguished cases in which plaintiffs were denied relief where they admitted that reorganizations occurred but alleged that the motives for the reorganizations were improper. 783 F.2d at 100–101, citing *Chestnut v. Lodge*, 34 Ill.2d 567, 216 N.E.2d 799 (1966); *Fitzsimmons v. O'Neill*, 214 Ill. 494, 73 N.E. 797 (1905); *Thomas v. City of Springfield Civil Service Comm.*, 106 Ill.App.3d 939, 62 Ill.Dec. 752, 436 N.E.2d 752 (4th Dist. 1982).

In this case, plaintiff does not specifically argue that no reorganization occurred. It is not disputed that plaintiff's position was abolished, that a new position was created at a lower level which involved different responsibilities, and that several other employees were reclassified upward or downward. The only dispute is over whether Sandra Brown assumed the duties which plaintiff had in actuality performed and thus, as plaintiff argues, "replaced" plaintiff. It is not disputed, however, that the responsibilities of the two positions, as described in their job descriptions, were completely different. The Court finds that issues over whether Brown in some sense "replaced" plaintiff are insufficient to allow a jury to find that no reorganization occurred. Defendant is therefore entitled to summary judgment on Count I because, under the reorganization exception, plaintiff was not entitled to a hearing in connection with her layoff.[15]

## IX. CONCLUSION

Plaintiff has failed to produce sufficient evidence to create a genuine issue of fact with respect to any of the five counts of her complaint. Defendants' motion for summary judgment is therefore granted.

---

**15.** Plaintiff devotes several pages of her brief to an argument that the procedures followed by defendants were inadequate as a matter of law. The Court does not reach this issue for two reasons. First, this argument is contained in the portion of plaintiff's brief which she offers in support of her own motion for summary judgment, which was stricken. *See supra* at n. 2. Second, the procedures followed by defendants are irrelevant in light of the Court's holding that, pursuant to the reorganization exception, plaintiff was not entitled to procedural due process.