Onelia LIMES–MILLER, Plaintiff,

v.

CITY OF CHICAGO and Fabiene Rogers, individually and in her official capacity, Defendants.

88 C 6221.

United States District Court, N.D. Illinois, E.D.

Sept. 16, 1991.

---

Laurie E. Leader, Gregg G. Rotter, Levin & Ginsburg, Ltd., Chicago, Ill., for plaintiff.

Kelly R. Welsh, Corp. Counsel, Jay M. Kertez, Barbara Smith, Maria C. Campo, Asst. Corp. Counsel, City of Chicago, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Onelia Limes–Miller ("Limes–Miller") sues the City of Chicago ("City") and Fabiene Rogers ("Rogers") under 42 U.S.C. § 1983 ("Section 1983") for their alleged violations of the Fourteenth Amendment's Equal Protection Clause (Count I) and the First Amendment's Free Speech Clause (Count II),[1] and she sues City alone under Section 1983 for its asserted violation of the Fourteenth Amendment's Due Process Clause (Count III) and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII"), for its alleged discrimination (Count IV) and retaliatory activity (Count V). Both defendants now move for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, defendants' motion is granted on all counts and this action is dismissed in its entirety.

---

1. Because both defendants are charged with actions under color of state (and not federal) law, Limes–Miller can advance such a claim only under the Fourteenth Amendment, with its in- corporation of Bill of Rights guaranties. This opinion will nevertheless follow the familiar (though technically imprecise) usage of refer-

*Facts* [2]

In May 1984 Limes–Miller began working for City in the Mayor's Office on Employment and Training ("MET") as a Senior Counselor for MET's Dislocated Worker's Program ("DWP"). During her MET tenure she was DWP's only Hispanic female professional employee. MET oversees and administers federal funds received by City under the Job Training Partnership Act (the "Act"), which provides employment and training opportunities to the economically disadvantaged and the dislocated worker population of Chicago. DWP provides retraining and employment services to workers affected by mass layoffs and plant closings and to long-term-unemployed individuals. Limes–Miller worked in DWP throughout her MET employment.

Rogers is a black female who started her employment with City in May 1986 as Deputy Director of Supportive Services for MET and then became Deputy Director of Administration in 1988. Next she was promoted to the position of First Deputy Director of MET. In 1987 Rogers supervised the DWP unit for about a month.

*Upgrade*

In 1985 Limes–Miller and Don Crocton ("Crocton"), a black male who was also hired in 1984, were working as DWP Senior Counselors, a position at pay grade 10. During late 1985 and early 1986 MET filled five vacant Counselor positions at pay grade 12 with persons who had not previously been working for City. Limes–Miller applied for an upgrade to Counselor in November 1985. Both she and Crocton were recommended for upgrade in January 1986 and were then upgraded effective in February 1986.

*Promotional Opportunities*

"Acting up" refers to performing duties of a higher position temporarily. Section 12.9 of an Agreement between City and the American Federation of State, County and Municipal Employees (the "Union Contract") generally governed the procedure for acting up appointments (P.Ex. 3B at 22):

> An employee who is directed to and does perform, or who is held accountable for, substantially all of the duties and responsibilities of a higher-rated job for more than ten (10) working days shall be paid at the higher rate for all such time, retroactive to the first day of the assignment. The Employer will equitably rotate such assignments on the basis of seniority among the employees at the work location who have the then-present ability to do the job without further training.

Section 12.9 went on to provide that employees paid for acting in a higher-rated job "shall be paid as if they had been promoted to the higher-rated job," and the maximum time limit for holding an acting up position was set at 90 days (*id.*).

There were three acting up appointments made from Limes–Miller's work division: Arturo Zendejas ("Zendejas"), a Hispanic male appointed in October 1987 to the position of Acting Coordinator of the Sears Transition Center; Phyllis "Nneka" Barnum ("Barnum"), a black female appointed in October 1987 to supervisor of the DWP division that was left at the Kraft Building; and Pearl Rightout ("Rightout"), a black female appointed to take Zendejas' position when he resigned in February 1988. Hispanic female Carmen Torres ("Torres") was originally recommended to take Zendejas' position but turned it down. Among other acting up appointments at MET generally, Carlene Tucker ("Tucker") and Car-

---

ring to the underlying First Amendment guaranty.

**2.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable" (*Bank Leumi Le-*

*Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted)) in the light most favorable to the nonmovant—in this case Limes–Miller. Both parties have filed statements as to the existence or nonexistence of material factual issues as required by this District Court's General Rule 12(m) and 12(n). Those statements are cited "D. 12(m) ¶—" and "P. 12(n) ¶—," respectively.

ol Cottrell ("Cottrell"), both black females, were respectively appointed to head MET's personnel functions in the spring and winter of 1988.

Some years earlier (in 1985) Limes–Miller had applied for a Manpower Planner position. City's Department of Personnel found her unqualified and Fred Burnside ("Burnside"), a black male, was selected for that position in October 1986.

*Transfers*

Limes–Miller requested a transfer in October 1986, and Rogers transferred her to the MET office at 5040 North Clark Street ("Clark Street"). Then in January 1987 Limes–Miller and co-worker Judy Smith, a black female, engaged in an altercation. Shortly afterwards Limes–Miller was transferred to the Kraft Building, a transfer to which she agreed.

In October 1987 Limes–Miller requested and was granted a transfer to work under Zendejas at the Sears Transition Center. In March 1988 she was transferred to 28 East Jackson Street ("Jackson Street"). Next she asked to be transferred back to the Kraft Building and was transferred there in December 1988.

In 1989 the entire DWP unit was transferred to the new MET office on North Orleans Street. Limes–Miller worked at that location until her last day at MET in February 1990.

*Duties*

Limes–Miller occasionally performed clerical duties but did not do so after she filed the Complaint in this case in 1988. She also conducted workshops. After a restructuring at the Sears Transition Center, workshops were no longer conducted there. Thereafter Limes–Miller conducted a few workshops elsewhere in 1988.

*Layoff (or Termination)*

In February 1990 Limes–Miller and the other three DWP Counselors—Barnum, Crocton and Ernest Rogers, a black male— were given a notice of a layoff due to "lack

of work." All three were assertedly laid off[3] on February 28, 1990.

*Charges*

In September 1986 Limes–Miller filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging sex and national origin discrimination. In November 1987 she filed another Charge of Discrimination alleging retaliation. In July 1988 she timely filed her initial complaint in this Court.

*Complaint*

Limes–Miller's First Amended Complaint (the "Complaint") comprises the five counts referred to earlier. They may be summarized this way:

*Count I:* Section 1983 claim against both City and Rogers for violation of the Equal Protection Clause, based on several alleged acts:

—promoting blacks at a rate higher than others similarly situated;

—continually denying Limes–Miller promotions as the only professional Hispanic female within DWP;

—unfair job assignments, instructions and derogatory remarks;

—assigning clerical duties to her and not to other Counselors, all of whom were of another sex and national origin;

—transferring her to different locations without notice;

—deliberately excluding her from meetings;

—cancelling her workshops;

—assigning black employees to more favorable jobs.

*Count II:* Section 1983 claim against both City and Rogers for violation of the Free Speech Clause because, after she had complained both formally and informally of employment discrimination against Hispanics and females, discrimination in service delivery against Hispanic residents of Chicago and unhealthful

---

**3.** Limes–Miller disputes that: She says she was terminated, not laid off. That issue will be

addressed later in this opinion.

working conditions, her free speech was assertedly chilled by:

—constant changing of her job duties and locations and assignment of clerical functions;

—threatening her with disciplinary action;

—creating documents to place in her file and build a record against her;

—denying her access to her personnel file for one month;

—assigning her to work locations that exacerbated her lung condition and repeatedly questioning the existence of such a condition;

—terminating her under false pretense of lack of work;

—inhibiting her from obtaining alternative employment.

*Count III:* Section 1983 claim against City for violation of the Due Process Clause in that she was terminated—not laid off—and was denied her right to a pre-termination or post-termination hearing.

*Count IV:* Title VII claim against City for discriminating against her on the basis of sex and national origin based upon the acts listed in Count I and also City's having:

—failed to interview or select her for any of five openings in the position of Counselor for which she had applied—all were filled by males, only one of whom was Hispanic;

—reclassified her as Counselor without explanation and without retroactive pay increase.

*Count V:* Title VII claim against City for retaliation in various forms:

—assigning her clerical duties;

—reassigning her to different work locations, often without necessary equipment;

—excluding her from meetings;

—cancelling her workshops;

—threatening her with disciplinary action and job loss;

—creating documents against her for her file;

—assigning her to work locations that exacerbated her lung condition and doubting the existence of such condition;

—terminating her under false pretense of lack of work.

This opinion will address each of those counts by first assessing City's Section 1983 liability under Counts I, II and III, then discussing Rogers' Section 1983 liability under Counts I and II, and finally assessing City's Title VII liability under Counts IV and V.

### City's Liability Under Section 1983 [4]

To make out a prima facie case in a Section 1983 action, Limes–Miller has to prove [5] (*Webb v. City of Chester, Illinois,* 813 F.2d 824, 828 (7th Cir.1987) (citations omitted)):

(1) defendants acted under color of state law, (2) defendants' actions deprived plaintiff of her rights, privileges, or immunities guaranteed by the Constitution, and (3) defendants' conduct proximately caused plaintiff's deprivation.

*Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) held that a municipality is liable under Section 1983 if it caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" (*id.* at 690, 98 S.Ct. at 2036) or "for constitutional deprivations visited pursuant to governmental 'custom' even though such ·a custom has not received formal approval through the body's

---

**4.** Suing Rogers in her official capacity is the same as suing City itself (*Kentucky v. Graham,* 473 U.S. 159, 165–67, 105 S.Ct. 3099, 3104–06, 87 L.Ed.2d 114 (1985)). Hence any such redundant claim must be dismissed (*Willis v. Bell,* 726 F.Supp. 1118, 1124 (N.D.Ill.1989)).

**5.** Although the text both here and later speaks of what Limes–Miller may or must "show" or

"prove," any such locution must be understood in the Rule 56 context as imposing on Limes–Miller the materially lesser burden of demonstrating the existence of a genuine issue of material fact on the claim being discussed. That latter standard has in fact been employed throughout this opinion.

official decisionmaking channels" (*id.* at 690–91, 98 S.Ct. at 2036). *Monell* rejected respondeat superior liability and concluded that municipalities could be held liable only when an injury was inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy" (*id.* at 694, 98 S.Ct. at 2037–38).

*Monell* remains the seminal decision in this area of the law, though later Supreme Court decisions have elaborated on the concepts it employed. Thus *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (citations omitted, emphasis in original) summarized the post-*Monell* decision in *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) in these terms:

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of *state law.* Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

■ "Final policymaking authority" where City is concerned does not allow for notions of implied authority or other general doctrines of agency (see *Santella v. City of Chicago*, 936 F.2d 328 (7th Cir.1991), affirming this Court's opinion at 721 F.Supp. 160 (N.D.Ill.1989)). Authority to determine City employment policy is vested only in the City Council and its Department of Personnel. Illinois law gives the City Council, as the "corporate authorities" (Ill. Rev.Stat. ch. 24, ¶ 1–1–2(2)),[6] the power to make all necessary rules and regulations (Section 1–2–1) and specifically the power to govern the relationship between City and its employees (Section 10–4–1). Pursuant to Chapter 2–74 of the Municipal Code of Chicago ("Code"), the City Council has established the Department of Personnel and granted to it certain authority to set personnel policy. Code § 2–74–050 authorizes the Commissioner of Personnel to issue personnel rules that establish City's employment policy.

*Count I: Equal Protection*

Official City policies prohibit employment discrimination of the type alleged by Limes–Miller in Count I. Code § 2–74–080 provides:

> No person shall discriminate against any employee or applicant because of race, color, sex ... [or] national origin....

Limes–Miller does not dispute that official prohibition. Instead she alleges that the complained-of actions were the result of an informal policy or custom—"the existence of an entrenched practice with the effective force of a formal policy" (*Gray v. Dane County*, 854 F.2d 179, 183 (7th Cir.1988)). As *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986) put it:

> The word "custom" generally implies a habitual practice or a course of action that characteristically is repeated under like circumstances.

That practice must be "persistent and widespread" to impute constructive knowledge to City policymakers (*id.,* quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036).

■ None of the acts claimed by Limes–Miller to have deprived her of equal protection amounts to a "custom" within the meaning of Section 1983. With the exception of the acting up appointments, all of the other incidents described in Count I were isolated occurrences that by definition do not amount to habitual or entrenched practices (*Gray,* 854 F.2d at 183 (citation and footnote omitted, brackets in original)):

> This court has held that "the isolated, intentional acts of an officer [without

---

**6.** Further citations to Chapter 24's provisions will take the form "Section—" (that conforms to the "§" usage employed by the Illinois General Assembly, rather than the "¶" designation used in the Smith–Hurd annotated version).

authority to set municipal policy] do not establish municipal liability under Section 1983," and has repeatedly affirmed dismissals of section 1983 claims that seek to impose municipal liability based on such isolated acts.

Nor do the acting up appointments meet the test that injury must be caused by "faults 'systemic in nature'" (*Strauss v. City of Chicago*, 760 F.2d 765, 770 (7th Cir.1985)). Five such appointments in the space of six years cannot be said to be so longstanding and widespread a practice that knowledge could be imputed to the City Council or the Commissioner of Personnel (cf. *Ramos v. City of Chicago*, 707 F.Supp. 345, 347 (N.D.Ill.1989) (sporadic incidents of police brutality do not indicate custom or policy)).

■ Even more fundamentally, Limes–Miller's claim fails because she has not shown that official policymakers were responsible for any alleged deprivation. Neither Rogers in any of her roles at MET nor the DWP supervisors—collectively the persons that Limes–Miller claims were responsible for the allegedly unconstitutional actions—had the authority to set policy imputable to City. All the complained-of decisions—promotional opportunities, transfers, job assignments—were made within the discretion of Limes–Miller's superiors and were not reviewed by City's policymakers. As stated in *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.

In sum, City has no direct responsibility, and *Monell* forecloses the use of respondeat superior to bootstrap City into such responsibility. Limes–Miller simply has no

avenue for establishing liability against City under Count I.[7]

*Count II: Freedom of Speech*

Here official City policy is that all employees shall have the right "to express [their] opinions on all political subjects" (Code § 2–74–090(A)). To the same effect, City entered into a consent decree in *Alliance to End Repression v. City of Chicago*, 561 F.Supp. 537, 559–74 (N.D.Ill.1982) in which it agreed not to "disrupt, interfere with or harass any *person* because of the person's *First Amendment conduct*" (*id.* at 562 (emphasis in original, simply indicating defined terms in the decree)). That decree represents official municipal policy as to decisions based on an employee's exercise of First Amendment rights (*Auriemma v. City of Chicago*, 747 F.Supp. 465, 471 n. 9, 472 (N.D.Ill.1990)).

■ Once again Limes–Miller contends that the violation of her free speech rights represented an unofficial custom under Section 1983—and once again she fails. There is nothing to suggest that the purported retaliation—conduct that she claims occurred in response to her exercise of free speech—was sanctioned by an official policymaker for City.[8] Again only subordinate officials such as Rogers are suggested to have instigated the alleged "custom."

■ Only Limes–Miller's assertion that she was terminated under false pretenses gives pause: It might perhaps evoke an inference that her layoff was a decision that would come to the attention of the Department of Personnel. According to *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (emphasis in original):

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have re-

---

**7.** That claim must also fail on the alternative ground that Limes–Miller has not shown any genuine issue of material fact supporting violation of her equal protection rights. That will become evident from the discussion of Rogers' liability under Count I later in this opinion.

**8.** It is worth noting parenthetically that even with the required favorable inferences, Limes–Miller has offered nothing at all to support

some of the acts of retaliation alleged in Count II: (1) threatening her with disciplinary action (she also admits that she was never subjected to disciplinary action (P. 12(n) ¶ 35)); (2) creating documents to place in her file and build a record against her; and (3) denying her access to her personnel file for one month. Therefore there are no genuine issues of material fact as to those claims in any event.

tained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

In this instance a layoff for "the absence of sufficient work" is permissible under City's Personnel Rule XII,[9] and there is no shred of evidence that a policymaking official such as the Commissioner of Personnel even reviewed the circumstances of the layoffs—let alone suspecting them to be a cover for suppressing rights of expression.[10] As explained in *Jones*, 787 F.2d at 204:

> [T]here must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation.

And so it is that *Praprotnik*, 485 U.S. at 130, 108 S.Ct. at 927 has said:

> [I]f a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware ... the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower ranking official. But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.

Thus Limes–Miller provides no evidence of any involvement or knowledge of a policymaking official, and she clearly fails to suggest a custom based on the isolated retaliatory acts that she alleges were taken only against her. That then defeats any Section 1983 claim against City under Count II.[11]

*Count III: Due Process*

■ Finally as to her Section 1983 claims against City, Limes–Miller likewise fails to establish a basis for liability for violation of the Due Process Clause. On that score official policy mandates the presentation of disciplinary charges and grants hearing rights and rights of appeal for all permanent employees in the career service "consistent with the requirements of due process of law" (Code § 2–74–050(12)). Code § 2–74–060 requires that the Personnel Board conduct a hearing of every appeal brought by a career service employee stemming from his or her discharge. Rule XII specifically sets forth specific criteria and procedures for reductions in force, including layoff of career service employees, while Rule XVIII provides specific criteria and hearing procedures for the discharge of career service employees.

Plainly, then, there can be no contention that official policy contributed to any asserted denials of due process in connection with Limes–Miller's layoff (or termination, as she would have it). And as for her argument that the alleged violation amounted to an informal custom, that is scotched for the same reasons as set out in the preceding Section of this opinion.

But there is more: Limes–Miller's claim is also fatally flawed because she was not

---

**9.** Further citations to the Personnel Rules will speak of "Rule—." No confusion can result from that duplicate usage of the word "Rule" in this opinion, because those Rules bear roman numerals while arabic numerals denote the Federal Rules of Civil Procedure.

**10.** Limes–Miller cites *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 283–84 (7th Cir.1986): Where the official is in a sufficiently high position such that his conduct is that of the governmental entity, then even a single incident can render the entity liable under Section 1983.

But only Mary Gonzalez Koenig, who held a non-policymaking position as MET Commissioner (see Koenig Aff. ¶ 2), signed off on the layoff notice. *Malak* simply does not fit the situation where the acting official assertedly flouts the policy set at a higher level.

**11.** As with Count I (see n. 7), Count II also loses on the alternative ground of the lack of any genuine issue of material fact that Limes–Miller's freedom of speech rights were violated. In that respect, see the discussion of Rogers' liability under Count II later in this opinion.

deprived of her right to due process to begin with. She does not (and cannot) contest the fact that she has no due process right to a hearing in connection with a *layoff.* Rule XII does not require a hearing for career service employees laid off pursuant to a change in organizational structure. It requires only notice and preferential placement on a reappointment list, and she received both of those. Rather, Limes–Miller argues that she was *terminated.* In that respect Personnel Rule XVIII requires hearings only when a career service employee was suspended or discharged for just cause.[12]

There is an exception to the hearing right when a discharge is caused by reorganization (*Misek,* 783 F.2d at 100; *Conroy v. City of Chicago,* 708 F.Supp. 927, 944 (N.D.Ill.1989)), and that exception is overcome only by a showing that the reorganization was a sham (*Misek,* 783 F.2d at 100–01; *Conroy,* 708 F.Supp. at 944). Moreover, such a showing is made not by questioning the motives of the reorganization, but instead by proving that the claimed reorganization did not occur (*id.* at 101; *Conroy,* 708 F.Supp. at 944).

Faced with those hurdles, Limes–Miller contends that she was actually terminated and that City's assertion that its action was taken pursuant to a reorganization is a sham. She asserts:

1. City's layoff notice put as its reason "Lack of Work" and not reorganization.

2. There was in fact no lack of work—the MET counselors were extremely busy, and City had just received a supplemental grant for DWP.

3. Other MET employees at a program called Chicago First continued to do the type of work she had been doing and she was never seriously considered for reappointment despite her placement on a reappointment list.

But City has produced uncontroverted evidence that a reorganization *did* occur (see Koenig Aff. and attached exhibits). In April 1989 Touche Ross was commissioned by the Illinois Department of Commerce and Community Affairs and City to perform an operations review and create a procedures manual for MET. Touche Ross recommended a restructuring of MET that included an elimination of its DWP unit (see *id.* Ex. A, Phase II, Step B, Task 5) because DWP Counselors were providing duplicate services to those furnished by outside delegate agencies under contract with MET. It was decided that elimination of the DWP unit would be cost-effective because the outside providers were not salaried. And it was contemplated that the reorganization would be completed by January 1990 (*id.* Ex. A at 4). As a result, all four of the DWP counselors were laid off in February 1990.

Limes–Miller has not countered any of that showing. City's labeling of the reason as "Lack of Work" rather than "reorganization" (they are listed as separate reasons for a layoff in Rule XII) creates no adverse inference in the face of City's just-outlined proof. "Lack of Work" is not inconsistent with the total elimination of the DWP Counselor position, so that the fact that MET counselors were busy is not cause for raised eyebrows.

As for Limes–Miller's other contention, even if the evidence she offers were competent to show that Chicago First employees performed similar duties,[13] that same testi-

---

12. Code § 2–74–060 mandates a hearing on all charges brought against any career service employee for purposes of discharge, demotion or suspension. In addition, Illinois law provides that no civil service employee may be removed except for cause upon written charges and after an opportunity to be heard in his or her own defense (Section 10–1–18). Such provisions gave Limes–Miller a Fourteenth Amendment property interest in her continued employment (*Misek v. City of Chicago,* 783 F.2d 98, 100 (7th Cir.1986), citing *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)). Hence she could be discharged only after notice and a meaningful opportunity to respond (*id.,* citing *Arnett v. Kennedy,* 416 U.S. 134, 170, 195–95, 226–27, 94 S.Ct. 1633, 1652, 1665, 1680, 40 L.Ed.2d 15 (1974)).

13. Defendants point out that the only supporting testimony is hearsay (P.Ex. C, E. Rogers Dep. 153–56) and is therefore not competent to defeat summary judgment (*Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 570 n. 4 (7th Cir.1989)).

mony explains that Chicago First employees were performing those functions before the reorganization. Thus the situation was not one in which new employees took over Limes–Miller's position under a different name, so as to suggest that the purported reorganization was a sham. Rather no one at all was hired to replace the DWP employees.

Finally, Limes–Miller has not shown that she was not seriously considered for reappointment—the only evidence before this Court shows that City sought her out for an interview in March 1990 but she was no longer interested in working at MET (P.Ex. 136). But that is immaterial in any event—for even if she had been terminated, it was for the purposes of reorganization, so she was still not entitled to a hearing.[14]

Again Limes–Miller comes up empty. She received all of the process due her.

### Rogers' Liability Under Section 1983

### Count I: Equal Protection

■ Limes–Miller's Equal Protection Clause claim requires a demonstration that she was treated differently from others similarly situated (*McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir.1989)):

> To establish a prima facie case [of race or sex discrimination under the Fourteenth Amendment] a plaintiff must show:
>
>> "that he or she is a member of a protected class, that he or she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from members of the unprotected class."

Additionally she must establish that defendants acted with discriminatory intent (*Webb*, 813 F.2d at 828). As *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (citation omitted) has stated:

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

Limes–Miller bears a heavier burden when she invokes the Constitution than she does under Title VII (*Forrester v. White*, 846 F.2d 29, 32 (7th Cir.1988) (per curiam) (citations omitted)):

> Under Title VII, the petitioner must prove that she was discriminated against through disparate treatment based on an impermissible factor, or disparate impact of a neutral practice on a protected group. In an Equal Protection claim, the petitioner faces the tougher standard of proving purposeful and intentional acts of discrimination based on her membership in a particular class, not just on an individual basis.

Limes–Miller's primary contention is that blacks who were similarly situated to herself were promoted and given acting up duties, while she was not. She cites the promotion of Burnside, the acting up appointments in her work division of Rightout, Zendejas and Barnum, and the acting up appointments of Tucker and Cottrell (all of those employees except Zendejas were black).

But that lineup reflects an impermissibly selective (and misleading) sample: Of the 27 acting up appointments in DWP as a whole through 1988, 17 went to blacks (63%) and 10 went to Hispanics (37%) (Atkinson Aff. ¶ 8 and Ex. E). During that same period the average percentage of blacks in the MET employee population was 64% and the Hispanic employee percentage was 17.5% (Carr Aff. ¶ 4 and Ex. C–2). Accordingly, both within Limes–Miller's work division and within DWP as a whole the rate of acting up appointments

---

**14.** That also renders irrelevant Barnum's testimony (1) that someone in personnel told her that she had been terminated and (2) that they were all forced out of the building a day before their layoff notices said they were to leave and a day after Limes–Miller had filed a grievance about the termination (P.Ex. B, Barnum Dep. 101–03). Whether Limes–Miller was constructively discharged is immaterial once it is found that a reorganization occurred.

for Hispanics exceeded the representation of Hispanics within the employee population. Similarly, the promotion rate of Hispanic females averaged 18.75%, while the average percentage of MET employees who were Hispanic females was 11.6% (Carr. Aff. ¶ 4 and Ex. C–2; Atkinson Aff. ¶ 8 and Ex. E).[15]

As for the other acts of purported discrimination that Limes–Miller alleges in Count I, they will be assessed in this opinion's Title VII analysis. Because Limes–Miller has a lesser burden there and because she fails to meet that burden, it follows a fortiori that those acts would not survive an Equal Protection analysis.[16]

*Count II: Freedom of Speech*

1. Substantive Claim

To establish the type of First Amendment violation that she asserts, Limes–Miller must show:

1. that her speech pertained to matters of public concern (*Hesse v. Board of Education of Township High School District No. 211, Cook County, Illinois,* 848 F.2d 748, 751 (7th Cir.1988));

2. that her interest in commenting on such matters outweighed City's legitimate employment interests (*id.* at 752); and

3. that her protected speech was a substantial factor motivating the challenged adverse actions (*Mt. Healthy Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)).

■ Whether the speech in question addressed a matter of public concern is a question of law (*Yoggerst v. Hedges,* 739

F.2d 293, 296 (7th Cir.1984)) that is determined by examining the content, form and context of the speech, as revealed by the whole record (*Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983)). Of those, content is the most important factor (*Yoggerst,* 739 F.2d at 296). *Hesse,* 848 F.2d at 752 (citations omitted, emphasis in original) provides guidance on the determination:

This court has recently reaffirmed its stance that even though an expression may inherently deal with a matter of public concern, the *Connick* test " 'requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?' " The Eleventh Circuit has also noted that "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."

Under that test it is clear that with a single possible exception, the statements made by Limes–Miller were made to further her own private interests—and that one exception does not save her claim.

■ First, Limes–Miller's complaints about unhealthful work conditions were consistently focused on her own health problems (D.R.Mem. Group Ex. 1):

—February 1985 memorandum requesting improved work conditions because current conditions worsened her lung condition;

**15.** Contrary to Limes–Miller's assertions, such statistics *are* relevant to counter an Equal Protection claim that charges discrimination based upon membership in a particular group rather than individual employment decisions.

**16.** Here too Limes–Miller loses for more than one reason. Like City, Rogers can be held liable under Section 1983 upon a showing of direct responsibility for the constitutional deprivation (*Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986)). Although Limes–Miller alleges that Rogers was involved in each of the acts listed under Count I, the evidence she tenders makes it difficult to sort out the acts in which Rogers

had a merely supervisory role and those in which she had a direct role. Limes–Miller has shown some evidence (beyond mere unsupported assertions) of Rogers' direct involvement in recommending the acting up appointments of Barnum and Zendejas (D.Ex. H, F. Rogers Dep. 56; P.Ex. 99), the transfer of Limes–Miller to Clark Street (P.Ex. 18; P.Ex. A, Limes–Miller Dep. 424) and the exclusion of Limes–Miller from meetings (P.Ex. B, Barnum Dep. 66). But as to all other acts alleged in Count I, Limes–Miller has not presented a genuine issue of material fact that Rogers was directly involved.

—June 1985 memorandum explaining that window sealant caused additional health problems for her;

—February 1986 memorandum requesting a humidifier because of student complaints about the heat and because she is an asthmatic;

—July 1986 memorandum requesting that she not be transferred to a particular location because excessive mildew and mold would exacerbate asthma;

—October 1986 memorandum reminding that she cannot be placed in a dusty or mold-ridden environment due to her allergies and asthma;

—November 1986 grievance form stating that management has failed to provide her with a decent sanitary work environment causing her health to deteriorate;

—November 1986 memorandum citing excessive heat causing health problems;

—October 1987 memorandum requesting an investigation of the health conditions in the Kraft Building due to heat and asbestos removal that have "exacerbated my lung function";

—October 1987 requesting transfer from Kraft Building because conditions have made asthma worse;

—October 1988 memorandum again stating that conditions at Kraft Building are bad for her health.

There can be no doubt that in those memoranda all of her "speech" relating to the work environment was personal in nature. Moreover, none of those complaints was directed *outside* of MET, nor did they arise against a background of ongoing public debate—thus rendering them poor candidates for First Amendment invocation to begin with (see, e.g., *Dorsett v. Board of*

*Trustees for State Colleges & Universities,* 940 F.2d 121, 125 (5th Cir.1991)).

Only one item in Limes–Miller's barrage of complaints included a broader focus as well: In October 1987 she filed a complaint with the Department of Labor about the asbestos removal in the Kraft Building in which, rather than limiting herself to her own health condition, she cited health problems of other employees, explaining that many workers told her. they had gotten sick, and she attached a petition she had circulated signed by 64 co-workers asking for an investigation of the quality of the air (P. Exs. 35, 36). Although that complaint comes closer to the mark of being public speech, surrounding circumstances overwhelmingly point to the fact that her own private concerns were the primary motivation in every other instance—and it is not a reasonable inference that the single possible exception bore a proximate causal relationship to City's adverse actions.[17]

Second, Limes–Miller has also not shown that her complaints about discrimination in the delivery of services to Hispanics rose to the level of public concern. She related concerns about an apparent understaffing as well as an unhealthful environment in the "Hispanic office" where she worked (P.Ex. A, Limes–Miller Dep. 109; P.Ex. 9), and she addressed a need for improvements in the Hispanic Job Search Workshop that she conducted (P. Exs. 132, 133, 134). In finding that concerns expressed by a public school teacher were not matters of public concern despite references to public education, *Hesse,* 848 F.2d at 752 repeated its statement in *Egger v. Phillips,* 710 F.2d 292, 318 (7th Cir.1983) (en banc) that "there is a difference between criticism directed at the institution in general

---

**17.** One swallow does not make a summer in any case—and it is simply not credible to ascribe the adverse actions that she now complains about to that single instance out of her host of purely personal memoranda. *Griffin v. Thomas,* 929 F.2d 1210 (7th Cir.1991) was an affirmance of this Court's opinion (724 F.Supp. 587 (N.D.Ill. 1989)), based on a *Connick* analysis. In *Griffin,* 929 F.2d at 1215 our Court of Appeals pointed to the fact that one of the 14 questions posed by the public employee's circulated questionnaire in *Connick* (that questionnaire was the claimed constitutionally protected speech in that case)

*did* "fall under the rubric of matters of 'public concern'" (461 U.S. at 148, 103 S.Ct. at 1690). That required the particularized balancing called for by *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (see the analysis in 461 U.S. at 149–54, 103 S.Ct. at 1691–94). But the difference is that the totality of the circumstances in *Connick* showed that the single expression of *public* concern "contributed to her discharge" (*id.* at 149, 103 S.Ct. at 1691), whereas here no such inference could reasonably be drawn.

and disputes with which the complainant has an intimate personal involvement." Rather than speaking out for the Hispanic community, Limes–Miller was primarily concerned about *her* job—the conditions of *her* office and the way *her* workshop was being run. Thus, despite her occasional references to the Hispanic community being served, the issues she raised were matters of a specific private concern.

Finally, Limes–Miller complains that she spoke out against discrimination against women and Hispanics. But she offers no facts to support that general allegation, so that there is no genuine issue of material fact that such speech was anything but personal.

In short, Limes–Miller's speech related merely private and not public concerns save in one arguable instance, and there she fails for lack of an inferential relationship to any adverse employment action. This opinion therefore need not reach the second weighing step of a First Amendment freedom of speech analysis, for Limes–Miller's First Amendment rights were really not implicated to begin with.

### 2. Qualified Immunity

 As with her other claims, Limes–Miller's Count II claim against Rogers must fail for a second and independent reason—this time because Rogers is entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) teaches:

> We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Whether an official violated clearly established constitutional protections is a question of law (*id.*).

At the time of the challenged actions here, spanning a period from 1986 until 1990, no established case law would have

put Rogers on notice that she was violating the law. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734, still the seminal case in the area,[18] set out a balancing test as between the speech rights of public officials and the interest in the efficient and successful operation of public business. As *Greenberg v. Kmetko*, 922 F.2d 382, 384 (7th Cir.1991) (emphasis in original) put the matter earlier this year:

> *Pickering* and its sequels stand for the proposition that speech on questions of public interest ought not to be deterred too much, or for too little reason, making it almost impossible to formulate bright lines. The employee's interest in speech is the same *qualitatively* whether the response is discharge, transfer without loss of pay, or a supervisor's curled lip. Yet there is a *quantitative* difference between discharge and a lateral arabesque, or between either of these and a snub.

*Greenberg, id.* at 385 granted qualified immunity to the officials involved there on the theory that:

> Principles of immunity relieve social workers and other staffers from having to decide, at their financial peril, how judges will balance these interests in the years to come. Governmental employees must obey the law in force at the time but need not predict its evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant.

Thus even if Limes–Miller could show that she engaged in public speech, that the adverse actions taken were in response to that speech and that those actions were in fact taken by Rogers (remember that each of those is an unproved hypothesis even in inferential terms), Rogers would still be entitled to qualified immunity—it would have been impossible for Rogers to know in advance the boundaries of legal action under the circumstances of this case. As just reiterated in *Woods v. City of Michigan*

---

**18.** At that time this Court was engaged in the practice of law and, as a pro bono matter, filed a brief for the ACLU (see 391 U.S. at 564, 88 S.Ct. at 1732) urging reversal of the lower court—the result reached by the Supreme Court.

*City, Indiana,* 940 F.2d 275, 280 (7th Cir. 1991):

> This court has stated that "qualified immunity is designed to shield from civil liability 'all but the plainly incompetent or those who knowingly violate the law.'"

### City's Title VII Liability

### Count IV: Discrimination

■ Limes–Miller offers no direct evidence of discrimination against her due to her sex or national origin.[19] This Court therefore looks to the familiar ping-pong approach dictated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) as rearticulated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citation omitted):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Limes–Miller's allegations will be dealt with one at a time under that formulation.

As for her lack of promotion or assignment to acting up positions, Limes–Miller can make out a prima facie case of sex or national-origin discrimination by showing (adapted from *Dugan v. Ball State University,* 815 F.2d 1132, 1136 (7th Cir.1987)):

> (1) she was in the protected group [female/Hispanic]; (2) City sought applicants for the promotion/acting up appointment, she applied and she was qualified for the promotion/acting up appointment sought; (3) she was not promoted/appointed; and (4) the promotion/appointment was given to someone else (though this component is not essential to the prima facie case, in this instance to a male/non-Hispanic).

All those elements except Limes–Miller's qualifications are undisputed, and although she offers only her own assertions that she was qualified for the positions, that may be enough at the prima facie stage (at least *Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 923 n. 6 (7th Cir.1988) has said that).

As for the one promotion that Limes–Miller says she was denied, City has said that she was not qualified for the Manpower Planner position—and Limes–Miller has offered no evidence at all to suggest that the reason was a pretext. As for the three acting up appointments made from Limes–Miller's DWP unit,[20] City explains each situation. As to Barnum, she was appointed to the position of acting DWP Supervisor at the Kraft Building after Limes–Miller had requested a transfer *out* of the Kraft Building and to the Sears Transition Center. Additionally, because the position was not a union position Limes–Miller had no right to it under the Union Contract (*In the Matter of Arbitration Between AFSCME Local 1215 and City of Chicago,* Grievance #90061 (July 28, 1988), D.R.Mem.App. A; Schedule of Union Positions, D.R.Mem. App. E). As to Hispanic male Zendejas, he was appointed to direct the Sears Transi-

19. Limes–Miller contends that MET Commissioner Arturo Vasquez and Rogers expressed a desire to "get rid of" her shortly after she filed this suit. Barnum testified that Vasquez made the comment at a meeting in 1988 (P.Ex. B, Barnum Dep. 67.). What is more relevant, however, is that *neither* Vasquez nor Rogers was employed in February 1990 when Limes–Miller was laid off, nor was *either* involved in the reorganization decision (Koenig Aff. ¶ 5). There is no evidence linking the asserted comment to a specific action, and no evidence that the statement was based on sex or national origin.

20. Both of the other acting up appointments mentioned earlier—those of Tucker and Cottrell in MET's personnel leadership—are irrelevant on the evidence presented. Neither of the appointees was from Limes–Miller's DWP unit, and so they were not situated similarly to her.

tion Center. Finally, Rightout was chosen to take Zendejas' place when he resigned. In the latter instance, though, the person originally recommended to take Zendejas' position was Torres, a Hispanic female who declined the position. It was Torres who recommended Rightout.

Limes–Miller has offered nothing to show that any of the three appointments was a pretext for national-origin or sex discrimination. Because one of the acting up appointments was given to a Hispanic and two to females, it would be difficult to infer that the City discriminated against either group taken separately. As for the combination of "Hispanic female," Limes–Miller was the only professional fitting that description in DWP. By drawing the circle with so narrow a radius, Limes–Miller would have it that *any* act favorable to another DWP employee was by definition "discriminatory." That is simply unacceptable.

Next Limes–Miller contends that five persons, all male and one of them Hispanic, were chosen for vacant Counselor positions, that she applied for those positions in November 1985 but was not interviewed, and that she eventually got an upgrade to Counselor in February 1986 only because she complained about it. For its part, City explains that in 1985 the two existing Senior Counselor positions that Limes–Miller and Crocton held were being audited for upgrade to the "Counselor" grade and title as part of an upgrade of the whole DWP unit—and indeed both of them were upgraded less than three months after Limes–Miller applied (Atkinson Aff. ¶¶ 4, 5) and six weeks after the new hires. Limes–Miller has not shown that reason to be a pretext for national-origin or sex discrimination. Furthermore, the one person who was really similarly situated—Crocton, a black male—was treated in exactly the same fashion as Limes–Miller.

Limes–Miller also asserts that she alone was given clerical duties that were outside of her grade classification. She claims that the clerical duties were increased when she was at Jackson Street under Rightout and then decreased when she returned to the DWP unit at the Kraft Building in December 1988. However, Limes–Miller testified that another white male working as a Counselor with her at Jackson Street (albeit as a temporary and not a professional) performed the same clerical duties, and (more importantly) she conceded that she personally did not know what the other Counselors were doing (P.Ex. A, Limes–Miller Dep. 718). She undercut her own contention when she admitted that some other Counselors were required to perform the same clerical duties that she was (D. Ex. G, Limes–Miller Dep. 922–23, 935–36). And Crocton testified that he too did clerical work (D. Ex. I, Crocton Dep. 20). No inference of discrimination can be made as to the assignment of clerical duties.

Next Limes–Miller claims that she was discriminated against in that she was transferred to various locations while others similarly situated were not. That is simply not the true story told by the transfers themselves.

Limes–Miller was transferred to Clark Street after she wrote a memorandum complaining that she could not work in the Kraft Building due to health reasons and that the Clark Street location would be suitable (P.Ex. 16). Although Limes–Miller adds that the room at Clark Street was not the one she requested and was ill-suited to her health, it appears that the only location to which she gave a clean bill of health [21] was one conference room in the Kraft Building. At worst the fact that the room was not assigned to her whenever she was at the Kraft Building might show health-oriented "discrimination"—but it surely does not show national-origin or sex discrimination. And even on the health issue, Barnum testified that everybody, not just Limes–Miller, suffered from unhealthful conditions at MET generally (P.Ex. B, Barnum Dep. 42–48).

Next Limes–Miller agreed to be transferred back to the Kraft Building after her altercation with Judy Smith. Nonetheless Limes–Miller argues that because Smith

---

21. Bad pun intended.

was black she was given preferential treatment by not being required to move. That is mere speculation and gives no real reason to infer a discriminatory motive.

Limes–Miller then requested and was granted a transfer to work under Zendejas at the Sears Project. Then she was transferred to 28 East Jackson Street, where she admitted she wanted to go because there was more space (D. Ex. G, Limes–Miller Dep. 501). Then she requested and received permission to be transferred back to the Kraft Building. Finally, the entire DWP unit was transferred to the new MET office on North Orleans Street. It can only be concluded that the bulk of the transfers were requested and that no discrimination was involved.

Next Limes–Miller complains that her workshops were cancelled while other employees continued to do workshops. Yet she admitted that all workshops at the Sears Transition Center were eliminated due to restructuring. Additionally she testified that she did continue to conduct workshops in 1987 and 1988. Limes–Miller has not shown a shred of a genuine issue of material fact as to pretext on that issue either.

Finally Limes–Miller claims that she was unilaterally excluded from staff meetings held by DWP supervisor Ron Burleson, a black male. Even if that is accepted, the only evidence she has to show a discriminatory reason is the surmise of co-worker Ernest Rogers that "if [she] would have been black she would have been right there in the meetings" (P.Ex. C, E. Rogers Dep. 185–86). Ernest Rogers' speculation was based on the facts that Limes–Miller was the only Hispanic in his unit (he said that everyone at the meetings was black) and that she and Fabiene Rogers did not get along. But as to the former, Limes–Miller admitted that Adrian Garcia, a Hispanic male counselor, did attend meetings held by Burleson (D. Ex. G, Limes–Miller Dep. 605).[22] And as to the latter, not getting along with your superiors does not equate to discrimination. Finally, because Ernest Rogers was a laid-off employee himself, the commentary in *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir.1991) is apropos:

> Discrimination law would be unmanageable if disgruntled employees—the friends of the plaintiff and often people in the same legal position as the plaintiff—could defeat summary judgment by affidavits speculating about the defendant's motives.

Limes–Miller cannot surmount the final hurdle in *McDonnell Douglas/Burdine*. Nothing supports the notion that any of the acts taken by City was a pretext for national-origin or sex discrimination.[23]

*Count V: Retaliation*

■ *Jennings v. Tinley Park Community Consolidated School District No. 146*, 796 F.2d 962, 966–67 (7th Cir.1986) teaches that to make out a prima facie case of retaliation under Title VII:

> the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that there is a causal link between the first two elements.

Limes–Miller claims that the City retaliated against her for filing various charges:

1. a charge of discrimination in September 1986;

2. a charge of retaliation in November 1987; and

3. her Complaint here in July 1988.

Limes–Miller must prove that the City would not have taken the action against her "but for" the filing of those charges (*Klein v. Trustees of Indiana University*, 766 F.2d 275, 280 (7th Cir.1985)).

---

22. So much for Ernest Rogers' testimony that everyone at the meetings was black.

23. Limes–Miller also alleges in her Rule 56 brief that she was denied a step-up increase. Because she did not make that claim in her EEOC charges or in the Complaint, it is barred at this stage (*Malhotra v. Cotter & Co.*, 885 F.2d 1305,

1312 (7th Cir.1989)). In any case, though, the evidence shows that Rogers corrected what she explained as an oversight, so that both Limes–Miller and Crocton were given the increase effective retroactively (P. Exs. 58, 60, 63; D.R.Mem. App. D, Crocton Dep. 43).

Of the actions that she characterizes as retaliatory,[24] this opinion has already shown that several cannot be said to have been adverse: the assignment of clerical duties,[25] the reassignment to different work locations and cancellation of workshops. That leaves only these matters as potentially adverse: not providing her with the room she requested and the necessary equipment, excluding her from meetings, assigning her to work locations that exacerbated her lung condition and doubting the existence of such condition, and laying her off.

Here Limes–Miller's problem is that she has not established any evidence of causation between her filing of the various claims and the allegedly adverse actions so as to support a finding of retaliation. She apparently relies exclusively on the fact that the assertedly retaliatory acts occurred throughout the time period from 1986 until she was laid off in February 1990.

But no causal inference can be raised by the timing in this case, for the events occurred over a three or four year period—with no one of them coming so directly on the heels of any of Limes–Miller's filings as to create a reasonable inference of causation (compare *Holland v. Jefferson National Life Ins. Co.,* 883 F.2d 1307, 1314–15 (7th Cir.1989) (one week between complaint and adverse action enough to raise factual issue as to causation) with *Maldonado v. Metra,* 743 F.Supp. 563, 568 (N.D.Ill.1990 (five month gap too large to create inference of causation)). For instance, she claims that after she filed suit in 1986 she was allowed to use the conference room in the Kraft Building but not often (P.Ex. A, Limes–Miller Dep. 445), but other than her assertion that the decline in use occurred *after* the suit was filed there is nothing to link up the two events. And her layoff occurred more than 1½ years after she filed her Complaint here, a gap too great to create an inference of retaliation (*Clark v. Chrysler Corp.,* 673 F.2d 921, 930 (7th Cir.1982)). Indeed, some of the events that she cites actually negate any conclusion as to causation. For example, she contends that Burleson excluded her from meetings immediately after becoming her supervisor in 1985—*before* she filed her first charge (D. Ex. G, Limes–Miller Dep. 605).

In short, Limes–Miller has not established that a number of the complained-of actions were adverse or that any of the others were taken in retaliation for her filing various charges. No predicate exists for finding the City liable under Title VII for retaliation.

## Conclusion

When a disgruntled ex-employee vents his or her spleen by launching a shotgun barrage of groundless charges against the ex-employer, the lawsuit ultimately loses (in this case the "ultimately" has come three years later). But in the meantime the justice system has been clogged to the exclusion of meritorious (or at least colorable) claims—and even worse, the entire legitimate area of employment discrimination litigation stands in peril of acquiring an undeserved taint.[26] There are no genuine issues of material fact as to any of Limes–Miller's claims against either the City or Rogers. This action is dismissed in its entirety.

---

**24.** Once again, Limes–Miller presents no facts to support her claims in Count V that retaliation occurred either in the form of threatening her with disciplinary action and job loss or by way of creating documents against her for her file. No genuine issue of material fact therefore exists as to those acts.

**25.** In any case, Limes–Miller testified that her clerical duties actually ceased after she filed the Complaint here.

**26.** Much the same phenomenon occurs when the comparatively low percentage of welfare frauds tends to give the whole system a black eye.